Avery & Sons v. Meikle & Co.

CASE 15—EQUITY—MARCH 27, 1883.

# Avery & Sons v. Meikle & Co.

APPEAL FROM LOUISVILLE CHANCERY COURT.

| 4r | 73 |
|---|---|
| 85 | 441 |

| 81 | 73 |
|---|---|
| 112 | 941 |

| 81 | 73 |
|---|---|
| f132 | 527 |

1. A trade-mark is a sign or symbol primarily confined to the indication of the origin or ownership of the goods to which it may be attached.
2. It may be composed of any name, device, or combination which will meet the purpose of a trade-mark, and which no other person can adopt or use with equal truth.
3. There is no abstract right in a trade-mark.   It is property only when appropriated and used to indicate the origin and ownership of goods.
4. When it is shown that a trade-mark has been infringed, and that injurious consequences are or may be the result of the infringement, the owner is entitled to relief.
5. The chancellor proceeds upon the principle of protecting property alone.   The protection of the public alone is not sufficient ground for the jurisdiction.   The property consists in the exclusive right of the owner of a trade-mark to be protected in the exercise of his ownership, and the exclusive right to its use.
6. The confusion which prevails in the argument against the jurisdiction in this case results from assuming that in all cases the plaintiff must make out a legal title.
7. If a party, with bad motive, uses his rights and property in an unlawful manner, and damage results, it is damage with injury, and relief will be given.
8. Appellees have not used any letters, figures, or words that belong to appellants' trade-mark proper; yet, by the exact imitation of the plow in every perceivable point exposed to an ordinary observer, and the use of the same coloring and staining, the same relative position of the letters and figures as employed by appellants, they have caused their plows to be taken for and purchased as those of appellants.
9. The case shows an intentional infringement, and not only probable injury, but facts from which the law presumes injury as a necessary consequence

W. O. & J. L. DODD, JOHN MASON BROWN, P. B. MUIR, AND JOHN MARSHALL FOR APPELLANTS.

1. B. F. Avery, or his successor, B. F. Avery & Sons, first adopted and used as distinguishing marks on plows the word "Pony," the letters "A O," "B O," and "C O," and the numerals "$\frac{1}{2}$," "1," "2," "3," and "8."

2. Plows so made and branded became known to the public as Avery's plows. These brands became a part of the trade-mark or trade *indicia* of Avery, and he is entitled to protection in their use upon like principles as where the trade-mark itself is taken or dismembered.

3. The appellees coveted the trade and reputation of Avery, and abandoned their brands and adopted the same brands as Avery, and on plows made in almost exact imitation thereof.

4. These imitation plows, when sold to jobbers, did not have Meikle's name on them, but the names of the jobbers were stencilled thereon.

5. Plows so made and branded, having the exact similitude of Avery's plows, could readily be sold to ordinary purchasers as and for Avery's plows, and were so sold.

6. If the plows so made and branded are likely or liable to deceive ordinary purchasers, or even the heedless and unwary, equity will enjoin such use. (Glenny v. Smith, 11 Jurist, 964; Coats v. Holbrook, 2 Ind. Ch. R., 586; Croft v. Day, 7 Beav., 84; Swift v. Day, 28 How. P., 206; Gorham Co. v. White, 14 Wall., 527; Singer v. Wilson, 24 Eng. R., 284; Lawrence Manufacturing Co. v. Lowell Hosiery Mills, 129 Mass., 325; Coleman v. Crump, 70 N. Y., 578; Walton v. Crowley, 3 Blatchf., 447; Franks v. Weaver, 10 Beav., 297.)

7. It is not necessary that the imitator should copy the *name* of the original maker. Relief will be granted if the special *indicia* which have become known as denoting A.'s goods are copied or simulated on *like* goods in such a way as to mislead purchasers. (Amoskeag Manufacturing Co. v. Spear, 2 Sand. S. C., 599; Gillott v. Esterbrook, 47 Barb., 455; Boardman v. Meriden Britannia Co., 35 Conn., 402.)

8. But conceding that none of the names, letters, or numerals are trade-marks, yet the relief prayed should be granted, because their use by appellees is for a fraudulent purpose. Even geographical names, when applied by a trader so as to become known by the designation, cannot be employed by a rival trader to effect a fraudulent purpose. (Watherspoon v. Currie, 5 H. L., 508; Newman v. Alvord, 49 Barb., 588; 10th Jur., N. S., 550.)

9. Courts of equity will enjoin the use of a man's own name when such use is employed for a fraudulent purpose. He will not be prohibited from using his name, but the manner of its use will be regulated. (Thorley's Cattle Food Co. v. Masson, 42 L. T. Rep., N. S., 851.)

10. It is not necessary that there should be an invasion of a technical trade-mark to obtain relief. If the same name or *indicia* are copied

Avery & Sons v. Meikle & Co.

in such a way as to induce persons to believe that they are dealing with the person who has given the name or *indicia* reputation, equity will give relief. (Knott v. Morgan, 2 Keen, 213; Croft v. Day, 7 Beav., 84; Lee v. Haley, 5 L. R., Ch. App., 161; Lea v. Wolff, 13 Abb. Pr., N. S., 389.)

11. It is sufficient if the court is satisfied that there was an intent on the part of appellees to palm off their goods as the goods of Avery. (McLean v. Fleming, 6 Otto, 245.)

12. Even if the wholesale buyer is not misled, but the small retailer or the consumer is, the right of action exists. (Dixon Crucible Co. v. Guygenheim, 2 Brews., 321; Clark v. Clark, 25 Barb., 76; Brooklyn White Lead Co. v. Massury, 25 Barb., 416.)

13. Courts of equity will not only protect the use of a trade-mark proper, but along with it all other *insignia* by which a trader may see fit to mark his goods. (Singer Manufacturing Co. v. Brill, Sup. Ct. Cincinnati, 1880.

14. Abandoning their own brands, and adopting those of a rival upon imitation plows, is a fact showing that they regarded it a thing desirable to be done in and of their piratical purpose. (McAndrew v. Bassett, 10 Jurist, N. S., 550.)

15. Whether there be property in a mark or not, a rival cannot use it for the purpose of deception. (Perry v. Truefitt, 6 Beav., 66.)

16. Even when there is no trade-mark or label, courts of equity will interfere if there is a fraudulent intention of palming off one's goods as and for those of another, and such intention is being carried into execution. (Morgan Sons & Co. v. Troxell, Cox M. T. M. C., No. 674; Sawyer v. Horn, 1 Feb. R., 24; Shaw Stocking Co. v. Mack, 12 Feb. R., p. 707; Hostetter v. Adams, 10 Feb. R., 838; Lawrence Manufacturing Co. v. Lowell Mills, 129 Mass., 325; Humphreys v. Wenz, 14 Feb. R., 250.)

17. The letters "H H" (Ransom v. Bentall, Codd. Di., 163), the letters "L L" (Kinahans v. Bolten, 15 Irish Ch. R., 75), the letters "XXX" (Cook v. Starkweather, Cox M. T. M. C., 221), and the numerals "303" (Gillott v. Esterbrook), "2340" (Boardman v. Meriden Britannia Co.), "830" (Shaw Stocking Co. v. Mack), "523" (Lawrence Co. v. Lowell Mills), and "1," "2," "3," and up to "35" (Humphrey v. Wenz), were in each case used for a fraudulent purpose, and their further use prohibited.

18. The nine plows of Avery present nine pictures, all with the same coloring, and all having like symbols, but each known to the public by a distinct name or mark. The nine plows of Meikle also present nine pictures. Compare them, and we find that each is a *fac simile* of some one of the plaintiffs'. Put them together, and instead of eighteen distinct pictures, we have nine pair. The picture must be broken. The fraudulent purpose is apparent.

Avery & Sons v. Meikle & Co.

19. The remedy at law is not adequate for the protection of trade reputation, and equity has always taken jurisdiction in proper cases. (Blofield v. Payne, 4 B. & A., 410; Leather Cloth Co. v. American Leather Cloth Co., Cox A. T. M. C., 688; Stone v. Carlan, Cox T. M. C., 116; Thompson v. Winchester, 19 Pick., 214.)

20. In each case of infringement of trade-mark or trade reputation, the relief to be granted must depend upon the peculiar circumstances of that case. (Gilman v. Hunnewell, 122 Mass., 150.)

21. In this case the defendants copied the plows and brands of plaintiff for the purpose of selling their plows as Avery plows, and for the purpose of appropriating the established trade of Avery, and the relief prayed should be granted, even if the plaintiff have not the exclusive right to use those brands and *indicia*. (Kinney v. Basch., 16 Am. L. Reg., N. S., 596.)

22. The appellees have been guilty of unfair and illegal competition in trade. Their conduct has been immoral, their methods and devices fraudulent, and they have been intentionally practicing deception upon the public, and pirating upon the trade and trade reputation of the appellants. In such cases the chancellor never fails to restrain the wrong-doer by injunction, and compel him to render an account. (Brown on Trade-marks, sec. 535; Moses v. Sargood, Cox M. T. M. C., No. 636; Braham v. Bristow, 1 H. & M., 447; Abbott v. the Bakers, &c., Cox M. T. M. C., 213.)

GEORGE M. DAVIE, JAMES S. PIRTLE, and W. LINDSAY for APPELLEES.

1. The symbols, No. A O, and "Pony," and B O, and C O, which are put on these various plows, are understood by the trade as indicating both the quality and size of the plow, and upon none of them, whether made by appellants or appellees, or any of the six or eight other manufacturers, is there anything else which indicates either quality or size. The sizes No. A O, and No. B O, for instance, are so nearly the same that the man who makes them cannot tell by looking at them, one from the other. He must put something on them to distinguish them, or measure their dimensions. By actual measurement, the plows will be found to differ one half of an inch in the cut of the share, and the larger one is numbered No. B O, to show that it is eight inches wide across the point and mold-board, and the still larger size is numbered No. C O, to show that it is a plow of eight and one half inches cut. The catalogues of all the manufacturers of these plows, all their price lists and circulars, explain these numbers in the same way. They have No. P O, No. A O, No. B O, No. C O, No. Pony, to indicate the several sizes, and explain the cut of each plow. These catalogues, these advertisements, which are circulated by the hundreds of thousands, and all communications between the manufacturer and dealer, and consumer and

dealer or manufacturer, refer to these letters as the only means of making known the several sizes of the steel plows. In ordering the plows, the dealers or consumers give the sizes desired by the numbers. They do not order one-horse steel plows, or two-horse steel plows, or small one-horse steel plows, but No. A O, or No. B O, or Pony, or No. P O, and the orders are understood as well as if given in the fully-expressed form.

2. The appellants' claim to the exclusive right to the use of the phrase, "keep all taps screwed up" upon plows, is not less untenable than their claims which have already been noticed. In the nature of things, such a phrase cannot be a trade-mark, and it must be the appellants' trade-mark on their plows in order that they should have the exclusive right to use it upon them. This phrase has a meaning, of course, and that meaning is plain. It is put upon the plows because, in their construction, taps are used, and it is essential that they should be kept tight, and it is deemed important to impress this fact on those who use them. The meaning is gathered by every one and is remembered, but the exact words are not. Some of the witnesses say the phrase is, "keep the nuts tight," others, "keep the bolts screwed up," or some equivalent phrase. No one looked to this stenciled expression to see who made the plow, and it was not, in any man's mind, connected with the origin of the plows. It lacks all the qualities of a trade-mark. I saw the other day on a box of salad-dressing the words, "keep in a cool place," and on a box of fragile goods the words, "handle with care." Could it be said that either expression was a trade-mark? As was said in a California case, Lucy v. Falkenburgh, Cox's Trade-mark Cases, 459, if such directions could become trade-marks, "the vender of medicines who first files his label with the usual instructions, 'to be taken before eating,' 'to be taken before going to bed,' 'to be well shaken before taken,' and so on to the end of the catalogue, may acquire an exclusive right to all the usual instructions which must necessarily accompany medicines, and thereby monopolize the trade."

3. In Gillott v. Esterbrook, Cox, 350, one of the questions was as to the right of the defendant to use the same words of caution on his label that were used by the plaintiff on the boxes of pens. The plaintiff claimed that he was entitled to the exclusive use of the phrase of caution, as an indication of the origin of his goods, and also of the words stating that the pens were manufactured under the superintendence of the maker. The court said: "I see no legal reason why the defendants may not print upon the labels which pass lengthwise nearly around the boxes in which their pens are put up, the superscription, 'these pens are manufactured under R. Esterbrook & Co.'s own superintendence,' notwithstanding this language (except the name of the manufacturer) is the same as that employed by the plaintiff upon his labels, and is a close imitation thereof in size,

Avery & Sons v. Meikle & Co.

color, and form of label. It would otherwise create a monopoly, not only in the sale of a particular kind of manufacture, more potent than a patent would confer, but a monopoly in the use of words in our language by one man against the rest of the world, which public policy would not tolerate."

### The Law in Regard to Resemblances.

4. When a label and package of a peculiar color and description have become associated with the manufactured article of a person, so as to form the whole or part of his trade-mark, a copy of the label or package, with differences which are merely colorable, although the name of the manufacturer so copying is attached to the label, will not be permitted, because purchasers may be taken not to look so much at the name of the maker as at the form and color of the package. The copying of that which signifies to the public who the maker is, is, in fact, copying his trade-mark; and, in many instances, the form and color of the package, or the peculiar printing, are all that has been used to distinguish the article from the product of other manufacturers. Upton on Trade-marks states the proposition in this form: "That the name and address of the manufacturer, used by him as a trade-mark, may have added to and connected with it some peculiar devices, vignette, emblem, symbols, forms, or figures adopted as auxiliaries to the name and address, in declaring the true origin and ownership of the merchandise, and a wrongful violation of such a trade-mark may be accomplished even though the name of the original manufacturer be omitted, and that of the imitator be substituted, by such an imitation of the peculiar device, vignette, emblem, symbol, form, color, or figure alone as indicates a design, and is calculated to mislead and deceive the public as to the origin and ownership of the goods."

5. Applying this principle the courts have, in many instances, restrained parties from using packages, boxes, or bottles, or labels which were palpable imitations of those used by another manufacturer and designed to mislead and deceive the public and calculated to accomplish that purpose. Any number of cases may be read sustaining this principle, where the matter in controversy was a box of pills, or of blucing, or a bottle of patent medicine, or of some fanciful compound for toilet use, or some other small package. In these cases the labels, or packages, were small, and the differences between the original and the imitation could only be observed upon careful examination.

### The Facts as to the Public being Misled and Deceived.

6. The appellants' witnesses who testified that they were misled into buying Meikle plows when they wanted Avery plows, swore that they were deceived by seeing either "A O" or "P O" on the Meikle plows, and mistook those having the latter letters on them for the

Avery & Sons v. Meikle & Co.

Avery "Pony" plow; there were no persons misled by the numerals on the cast-iron plows, or by the phrase "keep all taps screwed up." Such persons as these are not intended to be protected by the law. How could any protection be given to such stupidity? They are men going about with their eyes shut, who do not see, or will not see, that which would prevent even their own stupidity from misleading them. They blindfold themselves, and then complain that they cannot see.

7. Not one of these witnesses misunderstood the information which the defendants' name on the plows was intended to give; all that could read admitted that if they had looked at the name they would have seen that the plow was made by Thomas Meikle & Co. Ordinary attention would have enabled even these witnesses to distinguish the plows.

8. The chancellor who is asked to enjoin in such a case as this, is not compelled to listen to any evidence as to the effect of the marks of which complaint is made. He may judge for himself of the effect and of the probabilities of the public being misled, and in many cases the courts have acted upon their judgment, unassisted by testimony. In this instance the appellants were not willing to trust their case to the opinion the court might have, upon an inspection of the plows, as to their being calculated to mislead and deceive the public, but endeavored to give the case the color arising from multiplied instances of deception. On the 23d February, 1880, three weeks after this action was begun, the appellants sent word to all their agents to hunt up evidence for them, and started out on the road three of their traveling men, charged especially with the prosecution of the hunt for people who had been misled or deceived by appellees' marks into buying Meikle for Avery plows. One of these three made no report; another reported, but found no witness, and a third worked up a small slip of country in North Alabama. No other agent in the broad expanse of the southern country makes any report of any man who has been misled. The people inhabiting this region are the public whom appellants seek to protect; but, after all the effort made, none of them are found to need protection, except the thirteen men in North Alabama. One of the three traveling men went into that section in February and March, and prepared the land and sowed the seed, and in May, June, and July, after the same man and the industrious attorney of appellants passed through the region, going from house to house and farm to farm, and gathered the crop, and the result of their labors was, that thirteen persons, white and black, were found who had been deceived and misled by A O and P O on the Meikle plows *since the suit was commenced.* Not a man, either in Alabama or elsewhere, was misled before the action was brought. The appellants supposed that the public needed protection, but the public were not such asses as was imagined.

Such testimony is of no value, and, as an English judge said in a similar case, the court will not regard evidence of persons who were misled after the suit was begun. We know how easy such evidence is induced.

9. It is not the use of these figures and these letters that is the origin of this suit. They had been used by other persons for years after the Averys first commenced using them, and never a complaint made in regard to the use. They were used by numbers of manufacturers competing with them in the south, to indicate just what they indicate when found on Avery plows—the size and quality. No one ever heard of any trouble about that use. But when the manufacturer came into the trade who offered goods equal to theirs in every respect, goods, therefore, which could come into direct competition with theirs, then, for the first time, an outcry was made that their trade-mark was being violated—that illegal competition was practiced. The appellants did not stop before bringing their suit to see whether anybody had been misled. They assumed, from the very fact that these numbers were there, and that Thomas Meikle & Co. were doing a large trade, that people were misled.

10. It will not do to restrain the common law rights of people on such pretexts as these. It will not do for the court to act in violation of the rights of merchants. It will not do for this court to grant an injunction saying that a man shall not use that which everybody has a right to use, that which is used simply to give information to the people, which is for their benefit—not to mislead them, but only to show them that here is something of the same character as that with which you are acquainted, and of the same size as that with which you are acquainted. It has been said that the whole south is looking to this case. Well, they may; but the whole south is not looking for the maintenance of Avery's monopoly. That declaration, if true, shows that the people to whom these plows are sold, these people for whom they are made, know the difference between them; that they are not misled as to them; and if they are looking at all to this case, they are hoping that the monopoly will not be established, but that these plows may come to them as they come now, to take the place, in many instances, of plows which are sold to them at figures far beyond their worth. To that extent the people may look, but whether the people look or not, this court will decide according to the law.

11. The chancellor gave to this record a most careful examination, after a discussion of the law and facts, extending through many days, marked by all the power, ingenuity, and research of which the counsel engaged were capable, and the luminous opinion which he delivered will be unchallenged for its accuracy of statement and soundness of learning. He found no justification for the wholesale charges of fraud and deception so recklessly made by B. F. Avery & Sons, and

Avery & Sons v. Meikle & Co.

was entirely clear in his conclusion that any person of ordinary care can, even on casual inspection, easily distinguish the Meikle from the Avery plows. (Candee v. Deere, 54 Ills., 439; Amoskeag Manufacturing Company v. Spear, 2 Sandford, 599; Manufacturing Company v. Trainor, 101 U. S., 54; Stokes v. Landgraff, 17 Barbour, 608; Gillott v. Esterbrook, 47 Barbour, 455; Boardman v. Meriden Britannia Co., 35 Conn., 402.)

12. Words of direction for the use of a manufactured article, as "keep all taps screwed up," cannot be trade-marks. (Lucy v. Falkenburgh, Cox's Trade-mark Cases, 459; Gilman, etc., v. Hunnewell, 122 Mass., 149; Gillott v. Esterbrook, Cox, 350.)

13. If persons of ordinary understanding purchasing the articles, paying that attention which such persons usually do, would not be misled, resemblance is not such as would be enjoined. The court will not interfere for the sake of heedless persons. (Bradbury v. Beeton, Coddington's Digest, sec. 905; Partridge v. Menck, Cox, 75; Swift v. Dey, Cox, 323; Blackwell v. Crabb, Coddington, sec. 374; Blackwell v. Wright, 73 North Carolina, 310.)

CHIEF JUSTICE HARGIS DELIVERED THE OPINION OF THE COURT.

The appellants brought this action to restrain the infringement of their trade-mark, and to prevent the fraudulent usurpation of their trade reputation by the appellees, and to compel them to account for resulting profits.

The appellants are manufacturers of plows in the city of Louisville.

They brand on the right side of the beam their trademark, which is composed of a Maltese Cross, with the letters A V E R Y distributed in its center and arms. Immediately above the cross are the words "trade-mark," and below it are the words "copyrighted;" to the left of it the words "B. F. Avery's, patented," and to its right "Louisville steel, July 11, 1871."

The steel series of their plows are branded on the top and near the rear of the beam "Pony," "A O," "B O," and "C O," and their cast series at the same point with "½," "1," "2," "3," and "8." Upon the top of the fore part

of the beam of each series were stenciled the cautionary words, "keep all taps screwed up."

The appellants' trade-mark, which they printed and referred to in their catalogues, and described in their advertisements, is composed of the Maltese Cross, with the name A V E R Y distributed in its arms and center, surrounded by the words "trade-mark" above and "copyrighted" below it.

The appellees, who are also engaged in the manufacture of plows in the city of Louisville, dismantled plows of appellants'. steel and cast series, and, with great accuracy, copied every important and ordinarily noticeable part of them. They then began the structure of two series of plows, one steel and the other cast, so much like appellants' that an ordinary person could not tell the one from the other. They also imitated almost to perfection the interchangeable metal points of appellants' plows.

They branded the steel series "P O," "A O," "B O," "C O." The "P O" was followed by the word "steel," and "Louisville" was placed on top of the beam. Their cast series were branded "½," "1," "2," "3," "8."

Upon the top of the front part of the beam of each series were stenciled the cautionary words, "keep all taps screwed up."

These letters, numerals, and the words of caution, were in the same size and character of type, and placed in precisely the same position on their plows as on those of appellants. The plows were varnished as appellants' were varnished.

The resemblance of appellees' plows to those of appellants was complete, the only substantial difference being that the appellees placed on both sides of the beam their trade-

mark, ·which consists of an oblong figure and diamond, whose angles project over the lines of the oblong, with the letter " M " in the center of both, and encompassed by the name "Thos. Meikle & Co." above and "Louisville, Ky.," below.

The appellees held a consultation before they attempted the imitation above described, and after due deliberation and quieting Mr. Meikle's conscience, in the rough but significant language of one member of the firm, who seems to be its guiding spirit, they determined, come what may, "to take the bull by the horns." Then the work of dismantling and imitation began. Soon their newly dressed and formed series of cast and steel plows were thrown upon the market, and a business hitherto of thirty plows per day sprang up to nearly one hundred per day.

These increased sales were made, to a considerable extent, to jobbers, whose names were substituted for appellees' trade-mark and its surroundings, and stenciled on the beams where their trade-mark and name had stood. These jobbers did not pretend to be the originators or manufacturers of the plows, and it appears that many persons have been deceived and unable to distinguish the imitation from appellants' plows.

In order to make the imitation series, the appellees abandoned their brands "A," "B," "C," "D," and "F" on their cast, and the numerals "o," "1," "2," "3," "4," "5," and "6" on their steel plows, which they had been using, and substituted appellants' brands in their stead, placing the letters on the steel and the numerals on the cast series, so as to correspond precisely with appellants' mode of using them.

Whether the conduct of the appellees' amounts to an infringement of appellants' trade-mark, or an injury to their legal or equitable rights, is the question to be considered.

The object of trade-mark law is to prevent one person from selling his goods as those of another, to the injury of the latter and of the public. It grew out of the philosophy of the general rule that every man should so use his own property and rights as not to injure the property or rights of another, unless some priority of right or emergency exist to justify a necessarily different manner of use.

The intermediate instrument of prevention which the law protects in its office is called a trade-mark, which an owner of goods may adopt and use to indicate their origin or ownership, and to distinguish them from goods of a similar nature belonging to somebody else.

This right of adoption and use is subject to various limitations and qualifications.

A trade-mark is a sign or symbol primarily confined exclusively to the indication of the origin or ownership of the goods to which it may be attached, and it may be composed of any name, device, line, figure, mark, word, letter, numeral, or combination, or arrangement of any or all of these which would serve the sole purpose of a trade-mark, and which no other person can adopt or use with equal truth.

Fancy names, whether invented or arbitrary, the names of places, words, where applied to a new process by the inventor, the name of an article which alone designates its origin or ownership, letters and numerals combined in unusual and peculiar forms, or with other parts composing trade-marks, have been held, under the particular circumstances of the various cases, where their exclusive appropriation and use were in question, to be trade-marks or

component elements thereof. (See Congress Spring Co. v. High Rock Spring Co., 45 N. Y., 290; Burnett v. Phalon, 3 Keys, 594; Marsh v. Billings, 7 Cushing, 322; Woodward v. Lazar, 21 California, 444; Ford v. Foster, L. R., 7 Ch., 611; Taylor v. Carpenter, 3 Story, 458; Davis v. Kendall, 2 R. I., 566, in which the words "Eureka Shirt," "Persian Thread," "Vegetable Painkiller," "Congress Spring," "Cocoaine," "New Era," "Revere House," "What Cheer House," were held subject to exclusive appropriation as trade-marks.

In the cases of Wotherspoon v. Currie, 5 H. L., 508; McAndrew v. Bassett, 10 Jur., N. S.; Seixo v. Provezende, L. R., 1 Ch.; Newman v. Alvord, 49th Barb., "Glenfield Starch," "Anatolia Liquorice," "Seixo Wine," "Akron Cement," were protected as trade-marks.

For the word "original" as a trade-mark, see Cocks v. Chandler, L. R., 11 Eq.

Numerals in the cases of Boardman v. the Meridian Britannia Co., 35 Conn., 402; Gillott v. Esterbrook, 47 Barb., 455, were held to be, in connection with the manufacturer's name, a lawful trade-mark.

Browne on Trade-marks, section 87, says: "The mark may consist in the name of the manufacturer or the merchant (provided it be written, printed, branded, or stamped in a mode peculiar to itself) in a seal, a letter, a cipher, a monogram, or any other sign or symbol that can serve to distinguish the products of one man from those of another. It may be any symbol or emblem, however unmeaning in itself."

Terms which designate merely the name, quality, kind, size, number, or elements of an article, or have become its proper appellation, or that merely describe it, or direct the

mode of its use, purely generic and geographical terms, and the necessary and common uses in which the English language and Arabic numerals are employed by the people to express their ideas and feelings, and to tell the truth, are common property which all may use, but which none may exclusively appropriate as a trade-mark or acquire as absolute individual property. Many authorities have been examined, and might be here cited, to establish each clause of this general statement of the law, but it is not necessay to do so. It must not be overlooked, however, in these exclusions, that a trade-mark is indirectly the guaranty of the quality of an article to which it is attached, as well as of its origin and ownership, for in all cases the trade-mark, in indicating the origin, by necessary implication represents the quality of the article, which is the true source of its reputation in the market.

There is no abstract right in a trade-mark. It is property only when appropriated *and* used to indicate the origin or ownership of an article or goods. And its real value consists in the confidence and patronage of the public, secured through its instrumentality in acquainting them with the origin and ownership of an article, which thus gains reputation for its superior qualities. Of this reputation its owner cannot be deprived, without his consent, either by the use of forbidden means or the illegal employment of things otherwise lawful.

When a workman or manufacturer has, by skill, care, and fidelity, manufactured a good article, it becomes of the utmost importance to him that its origin and ownership should be known, and the law points out to him what means and how he may appropriate them to indicate this important fact, and when he adopts and uses them, and his repu-

Avery & Sons v. Meikle & Co.

tation is thereby built up, it is to him the most valuable of property rights.    Sound policy, which dictates the protection of the public from imposition, the security of the fruits of labor to the laborer, the encouragement of skillful industry, and, above everything, the inculcation of truth and honor in the conduct of trade and commerce, and the requirement that all the contractual relations of life, natural, abstract, and relative, shall be honestly observed, demands that such a reputation so gained should be free from the grasp of piracy, and its infringement accorded the safest and best remedy for redress known to the courts of equity. And this is the law of both principle and authority.

Therefore, the lawful adoption and use of a trade-mark is the invocation of the law applicable to it, by the originator or owner of an article, for the protection of his reputation as such.

When this essential state of facts is shown by a complainant, and that his trade-mark has been infringed, and actual, probable, or possible injurious consequences is or may be the result of the infringement, he is entitled to relief, which is usually granted by injunction, and an account of profits.

Having premised these general rules of the law of trademark, the field of investigation we shall first explore is, whether the appellants' trade-mark embraces either the word "Pony," the letters "A O," "B O," "C O," or the numerals "½," "1," "2," "3," "8," or the shape and construction of their plows.

We will dispose of the last point first. The shape and construction of the plows do not form any part of the trademark of the appellants, further than their subjection to the use of the mark to indicate their origin and make is neces-

sary to render the trade-mark property, for, as held in
Candee, Swann & Co. v. Deer & Co., 54 Ill., page 461,
where no patent is held by the owner of plows, "any one,
therefore, has a perfect right to make plows in their exact
similitude, even to "the curve of the mould-board," and
"the tip of the handles"—in the minutest, as well as in the
most important points—all have a right to manufacture
them, no matter where the maker may reside, and has the
right to put the name of the place where manufactured, as
well as his own name, on such part of the plows as he
pleases, *taking care, however, so to use the brand as not to
deceive the public, so as not to create a belief that the plow is
the manufacture of another."*

Other cases which express it differently are to the same
effect. (Fairbanks v. Jacobus, 14 Blatchford, 339.)

The evidence shows that, as early as the year 1868, the
word "Pony" was adopted and used by Kelley, of Texas,
on a small one-horse plow, which he was then engaged in
the manufacture of, and that the appellants did not adopt
or use it prior to 1871. Hence, they have not the merit of
first appropriation, which is necessary to an exclusive right
to the word "Pony" even as a trade-mark. But where the
evidence, as in this case, establishes that the word "Pony"
is used to indicate quality and size, to-wit, a small steel
plow, it cannot, for such use, become a trade-mark. And
it does not matter that "Pony" is not in itself the sign of
the idea of size or quality; for if it was substituted for the
words which would convey such meaning, and used by ap-
pellants for that purpose, they could not have acquired,
even by prior adoption, an exclusive right to the use of
the word "Pony." (Amoskeag Manufacturing Company
v. Spear, Cox T. M. C., 102.)

Many years before the appellants adopted "A O," "B O," "C O," it was customary to use letters and combinations of letters to indicate quality, size, and series of plows.

"C O" were in use before appellants used them. But whether they used the combinations of these letters first or not, the evidence shows that they used them to indicate the size and quality of the steel series.

As to the numerals "½," "1," "2," "3," "8," they were used by appellants to denote the size and quality of their cast series. This is the evidence, and although the letters and numerals on both series may have come to indicate to the public the origin or ownership of appellants' plows, as they did not appropriate them by adoption, use, or claim, as a part of their trade-mark, they cannot be treated as a part of it simply because they appear capable of serving the same purpose.

The printed catalogues and advertisements of the appellants do not claim that these letters or numerals form any part of the trade-mark; yet all through them attention is called to the Maltese Cross, and the words in and immediately around it, as their trade-mark. Had "A O," "B O," "C O," and "½," "1," "2," "3," and "8," or any of them, formed a part of the appellants' trade-mark, it is unreasonable and contrary to human experience to suppose that the fact would have been ignored for years, and excluded from their carefully prepared and printed annual catalogues and advertisements.

The cautionary words, "keep all taps screwed up," are not the subject of a claim to exclusive use, as has been held and well settled in the cases of Falkinburg v. Lucy, Cox T. M. C., 465–'6; Gillott v. Esterbrook, *Ibid.*, 350; Gilman, &c., v. Hunnewell, &c., 122 Mass., 149, and because they

are words of caution which the appellees may use with equal truth, sincerity, and from a necessity common to the use and handling of plows.

The alphabet, English vocabulary, and Arabic numerals, are to man, in conveying his thoughts, feelings, and the truth, what air, light, and water are to him in the enjoy- ment of his physical being. Neither can be taken from him. They are the common property of mankind, in which all have an equal share and character of interest. From these fountains whosoever will may drink, but an exclusive right to do so cannot be acquired by any. And the appel- lants, having drawn from the common fountain the letters and numerals named, cannot claim an exclusive right to them or their use.

Having disposed of the appellants' alleged title to the exclusive use of the letters "A O," "B O," "C O," the word "Pony," and the numerals "½," "1," "2," "3," "8," we are brought face to face with an exceedingly im- portant question, whose solution will settle the merits of this controversy. It is, whether courts of equity will afford a remedy against the invasion of and injury to a trade-mark, or the trade reputation of its owner which he has acquired through the trade-mark itself, or its accompanying *indicia*, which represent only the quality, size, character, descrip- tion, or caution in the use of the article to which the trade- mark is attached.

The ground of jurisdiction is one thing, and the evidence or fact of infringement is another.

Courts of equity proceed "on the principle of protecting property alone," and the promotion of honesty and fair deal- ing. The protection of the public alone is not sufficient

ground for the jurisdiction.    However, it is an element which enters, and ought to enter, into every case.

The property really consists in the exclusive right of a manufacturer or owner to sell his products or goods as his own, and in being protected in the exercise of that right by the exclusion of all others from its enjoyment, either by selling theirs for his or causing others to do so.

It is not necessary to a recovery in equity, where the trade-mark itself, in whole or in part, has been appropriated, to prove fraud or an inferiority of quality of the article of the defendant.    This principle is based on the ground that a trade-mark, when in use, is property itself.    (Edelston v. Edelston, 1 De G., J. & S., 185.)

But when the infringement of the property-right has been committed by other means than the appropriation of the trade-mark itself, it is essential, even in equity, to show a fraudulent intent, otherwise there could be no safety in the use of those things which are common to all, and which cannot be exclusively appropriated; as to them, no legal injury can flow from their innocent, ordinary, or proper use.

At law special damage, unless damage is presumed, deceit, or fraudulent intent, must be proven in all cases to warrant a recovery.    This is not, as we have stated, universally so in equity, but it is common to both law and equity where the infringement is perpetrated by other modes and means than the use of any part of a trade-mark itself.

The remedy at law is not adequate, in all cases, to the protection of this species of property, commonly known as trade reputation, because no injunction can be had against a continuation of the injury, and nothing but nominal recovery, unless special damages are shown.    (Blofeld v. Payne, 4 B. & Ad., 410, King's Bench.)

The deficiency of the remedy at law has caused the courts of equity to take jurisdiction of this class of cases, and extend protection to this great right of property, in whose exercise the public are deeply interested, and in whose maintenance the commercial honor and trade integrity of the state are profoundly concerned:

The ascertainment and explanation of that jurisdiction will be followed by the discussion of the law of infringement, and the analysis and application thereto of the facts of this record.

In the rather noted case of the Leather Cloth Co. v. American Leather Cloth Co., House of Lords, reported in Cox T. M. C., on which the appellees rely for the remarkable doctrine that no protection can be given unless the appellants show they have a technical trade-mark, all or some part of which has been appropriated and used by the appellees to their injury, the lord chancellor reversed the vice chancellor, because the plaintiff's alleged trade-mark was not a trade-mark, and it contained misrepresentations amounting to a fraud upon the public.

In criticising the views of the lower court, the lord chancellor stated the doctrine to be:

"*First.* The goods of one may be sold as the goods of another without giving to that other person a right to complain, *unless he sustains, or is likely to sustain, from the wrongful act, some pecuniary loss or damage.*   . . . . . . .

"*Second. It is not requisite for the exercise of the jurisdiction, there should be fraud or imposition practiced by the defendant at all.*"

The last proposition was laid down with reference to a trade-mark proper, and is undoubtedly the law. The first proposition is equally sound, and is applicable, whether

Avery & Sons v. Meikle & Co.

there is a trade-mark shown to have been dismembered or not, if the goods of one have been intentionally and fraudulently sold as the goods of another, and he has sustained damage, or the former threatens to continue his acts, which the court is bound to conclude will result in damage.

This extension of the lord chancellor's unnecessarily restricted views, is justified by what was said in the house of lords, on appeal in the same case, by Lords Cranworth, Kingsdown, and the lord chancellor himself.

Lord Kingsdown declared it to be the law, and no one disputed it, that the defendants "had no right, directly or *indirectly*, to represent that the article which they sold as manufactured by Cricketts, or by any person to whom Cricketts had assigned their business or their rights. They had no right to do this *either by positive statement* or by *adopting* the *trade-mark*, . . . or by using a trade-mark so nearly resembling that of plaintiffs as to be calculated to mislead incautious purchasers." He makes a manifest distinction between making a "*positive statement*" and the usurping of *a trade-mark* as a means of infringement.

Lord Cranworth said, that " the lord chancellor observes that the ground on which courts of law and courts of equity have interfered in the case of trade-marks has not been well defined, and has not been made to rest on any satisfactory principle." That he did not think it necessary to go into the question whether the trade-mark, if it could be one, of appellants, as used by them, was entitled to protection, as it was a question of some nicety, for he thought "it clear that there was in this case no infringement."

The lord chancellor concluded by saying he was satisfied " that I assigned for my decision in the court below a ground *narrower* than I might have taken as the basis of that judg-

ment," and admitted that he did not "enter into the consideration *of the wider view of the subject,* which has been so forcibly urged by my noble and learned friends," and concluded that the appellant had no trade-mark at all; that it was nothing more than an advertisement, which had not been substantially imitated by the appellees.

It results, from these observations, that the grounds of jurisdiction were laid down too narrowly by the lord chancellor, and in a manner not necessary to the decision of the case, and that, so far from that case contracting the jurisdiction of the courts of equity to the narrow limits of an action at law, or within the bounds prescribed by the instruments with which the wrong may be done, it virtually concedes the jurisdiction to protect the complainants had they come with clean hands, and shown that the defendants, either directly or indirectly, by positive statement or adoption of a known or rightfully possessed and used trade-mark, represented the article they sold as manufactured by the complainants, and that they had sustained, or were likely to sustain, damage by reason of the wrongful act.

After repeating the principle that no man has a right to sell his own goods as the goods of another, nor to dress himself in colors and symbols to which he has no exclusive right, and thereby personate another, or represent that he is selling the manufacture of such other, while, in reality, he is selling his own, the Master of the Rolls, in Croft v. Day, Cox T. M. C., 657, said: "The right which any person may have to the protection of this court does not depend upon any exclusive right which he may be supposed to have *to a particular name, or to a particular form of words.* His right is to be protected against fraud, and fraud may be practiced against him by *means* of a name, though the per-

son practicing it may have *a perfect right to use that name,* provided he does not accompany the use of it with such *other circumstances as to effect a fraud upon others.*"

This doctrine was quoted and approved in the case of Stone v. Carlan, 13 Mo. L. R., 360; Cox T. M. C., page 116, where the false pretenses of the defendant were made the basis of the relief, and the use of badges, symbols, and similar carriages, all of which might have been properly used, as they were not exclusively the property of the complainant, were held to have been *so* used, under the circumstances of that case, as to amount to fraud, although it is clear that the name of the hotel, "Irving Hotel" or "Irving House," was the only thing among the complainant's signs and symbols that could be treated as exclusively appropriated by him as a trade-mark within the meaning of the law.

So in the case of Knott v. Morgan, the words "Conveyance Company" and "London Conveyance Company," and other words used by complainants, were held to be common property, and therefore not the subject of exclusive right; yet the court said "they have a right to call upon this court to restrain the defendant from *fraudulently using precisely the same words and devices* which they have taken for the purpose of distinguishing their property, and thereby depriving them of the fair profits of their business by attracting custom on the false representation that carriages, really the defendants, belong to "and are under the management of plaintiffs."

What were those words and devices? They were not trade-marks, just as "A O," "B O," "C O," "Pony," and "½," "1," "2," "3," and "8" are not trade-marks; yet their combination and *use*, because not to designate the defendant's omnibuses and business, but to imitate the plaint-

iff's, and thereby attract his custom and take his profits, were held to be illegal.

The case of Lemoine v. Ganton, 2 E. D. Smith, 343, was where the complainant had abandoned one trade-mark and adopted another, and a verdict for nominal damages was sustained in his favor against the defendant who had assumed the discarded trade-mark, and thereby sold his calf-skins as the manufacture of the complainant, the court saying, "it makes no difference whether that object was effected by counterfeiting the trade-mark which he uses at present, or one that he formerly used." In that case, certainly, title to the trade-mark by which the fraud was committed was not shown, and it was not necessary to show it.

The supreme court of the United States used this language in McLean v. Fleming, 96th U. S., 254: "Nor is it necessary, in order to give a right to an injunction, that a *specific trade-mark should be infringed;* but it is sufficient that the court is satisfied that there was an intent on the part of the respondent to palm off his goods as the goods of the complainant, and that he persists in so doing after being requested to desist."

The court, with approval, cites the case of Woollam v. Ratcliff, 1 Hem. & M., 259, in support of their opinion.

Such is the ruling of the supreme judicial court of Massachusetts in the case of Thompson v. Winchester, 19 Pick., 214.

Thompson invented certain medicines, which he designated "Thompsonian medicines," and the evidence offered by him to make out his case was to the effect that the defendant had prepared medicines of an inferior quality, and had sold the same as pure Thompsonian medicines, *and as and for medicines prepared by plaintiff himself.* The court

Avery & Sons v. Meikle & Co.

rejected this evidence, and the jury, under instructions in accord with that ruling, found for defendant, but the supreme court reversed the case, and said "that if the defendant made and sold medicines calling them 'Thompsonian medicines,' and sold them, or placed them in the hands of others to sell, as *and for medicines made and prepared by the plaintiff*, so that persons purchasing the same supposed and believed that they were purchasing the medicines made and prepared by the plaintiff, it was a fraud upon the plaintiff and an injury to his rights, for which the law will presume some damage," citing Sykes v. Sykes, 3 Barn. & C., 541, which is to the same effect. The words "Thompsonian medicines" had become their proper appellation, and therefore not subject to exclusive appropriation, and the defendant had the right to prepare medicines of an inferior quality, and call them by that name; yet he was held responsible *for selling his medicines as those of the plaintiff*. This case illustrates the rule suggested in the beginning of this opinion, that at law the plaintiff who has an exclusive right to a trade-mark has no right to recover where the trade-mark alone has been taken, unless special damages be shown, and that, whether he has a trade-mark proper or not, if by fraudulent means and with fraudulent intent the defendant sells his goods as and for those of the plaintiff, the law will presume some damage, and he "will be entitled to recover nominal damage at least, and something more if he can make it appear that he has sustained more than nominal damages." It is plain, from these authorities, that the damage at law does not grow out of the mere adoption of a trade-mark, but it arises from the fact that sales have been

made by defendant of his goods as and for the plaintiff's goods.

This results in damages, either by curtailing the amount of plaintiff's sales or substituting inferior goods for his, which injures his reputation.   For this damage he has his remedy, because it grows out of a legal injury.

In Singleton v.  Bolton, 3 Doug., 293, Lord Mansfield said,  ''that if the defendant had sold a medicine of his own under the plaintiff's name or mark, that would be a fraud for which an action would lie;'' but he non-suited the plaintiff, because he and defendant used the name of the original inventor, which had become evidently the proper appellation of the ointment, and because *''no evidence was given of the defendant having sold it as if prepared by the plaintiff.''*

The case of Morgan Sons & Co. v. Troxell is important, because no trade-mark was there dismembered and the parts appropriated for the accomplishment of the fraud; yet the court granted relief, saying:  '' We deem it, then, to be well settled that, to justify the interference by injunction of a court of equity, it is *sufficient* that there is a *fraudulent intention* of palming off the defendant's goods as those of the plaintiffs', and that such intention is being carried into execution.'' . . .   This case was subsequently reversed because of insufficient proof, the court saying:  '' What remedy there is for such a wrong, if proved, is not necessary now to inquire.''   (89th N. Y., 298.)

In Perry v. Truefitt, 6 Beavan, 66, Lord Langdale said: '' I think that the principle on which both the courts of law and equity proceed, in granting relief and protection in cases of this sort, is very well understood.   A man is not to sell his own goods under the pretense that they are the goods of

Avery & Sons v. Meikle & Co.

another man; he cannot be permitted to practice such a deception, nor *to use the means which contribute to that end.*"

In Singer Manufacturing Co. v. Brill, Superior Court, Cincinnati, the judge delivering the opinion said: "It is competent for one engaged in business to protect that business and the reputation he may acquire by more ways than one, and the law will not allow a man, when called to account for an infringement of an adopted means of protection, to defend by answering that the complainant has still other marks or means whereby to protect himself that he has not interfered with. And accordingly it has been held that 'it will make no difference that the plaintiff has also a trade-mark which has not been taken by the defendant.'" (Braham v. Bustard, 1 Hem. & Miller, 447.)

The supreme court of New York, 1872, in Cook v. Starkweather, C. M. T. M., page 221, held, "that whether the plaintiffs *were or were not entitled to the exclusive use of the words* 'Valley Whisky' or 'Old Valley Whisky,' which was not clearly established, the *course of conduct* adopted by the defendants was *intended* and *calculated* to *deceive*, and the plaintiffs were *therefore* entitled to an injunction."

Kinney v. Basch is analyzed by Cox M. T. M., p. 304, where it is said: "The plaintiff being a manufacturer of cigarettes, on which he used a label containing a device of sun's rays, the words 'St. James,' and the symbol '½,' the defendants sold other cigarettes with the label containing the words 'St. James Parish Perique Cigarettes' (of which the words 'St. James' were much the more conspicuous) and the symbol '½,' in the same style as the plaintiff's, but the labels were in other respects different.

"Injunction granted to restrain the defendants from using the device of the sun's rays, and also the symbol '½,' and

words 'St. James,' alleged to be the plaintiff's trade-marks, *on the ground that whether the plaintiff had or had not an exclusive right* in the marks, the defendants had *so acted* as to *deceive.*"

Van Bunt, J., places the jurisdiction on the ground of fraud upon the public, even at the suit of a plaintiff who has not the exclusive right to the use of the words, numerals, or symbols.    While we think fraud upon the public may enter into the ground of jurisdiction, it of itself, in our judgment, is not sufficient unless some probable or possible injury to the plaintiff is shown.    If the plaintiff cannot show that his rights or interests are injured or taken from him, he can have no standing in court, for strictly he represents the public no more than any one else.

The confusion which prevails in the argument against the jurisdiction in this case results from assuming that in all cases the complainant must make out a legal title to an exclusive trade-mark by means of which, or some part of which, the defendant has done the wrong and injury to his rights.

The authorities do not sustain this assumption, but, on the contrary, are numerous and strong that the wrong consists in one person fraudulently selling his goods as and for those of another, either by the use of the other's trade-mark or *indicia*, or by any means whatever, if such fraudulent practices result, or are likely to result, in damage to the complainant.

In fact, none of the cases at law which we have examined require the plaintiff to prove the existence of a trade-mark strictly and his title thereto, in order to recover for the fraudulent sale by another of his goods as those of the plaintiff.

There is good reason in support of this principle. Sup-pose A has earned a great reputation for making and selling plows which he does not mark at all, but which are known in the market by their perfection in shape and finish, and B makes a plow precisely like it in appearance, but not one fourth so valuable intrinsically, could B go about, with impunity, for his own gain, to injure A and deceive the public, selling his plows as and for those of A, by orally misrepresenting them as A's plows? We are inclined to the view that A would have his action for deceit and fraud which would, if not checked, finally break down his reputation for making a good article.

This view is not, however, in its full breadth, necessary to the decision of this case, but it illustrates the reason which underlies the well understood jurisdiction of courts of equity which they now exercise in preventing the unjust work of deceit, misrepresentation, and fraud, by intercepting their gains and restraining the use of their chosen weapons.

As the object of the courts of equity is to prevent one man injuring another's rights by selling his goods as those of the other, why not prevent all fraudulent misrepresentation, whether oral, by signs, symbols, trade-marks, labels, words, or figures, by which that wrong is accomplished? The injury is the same, no matter how nor by what means it may be done, and the responsibility should attach when that injury is deliberately and fraudulently committed.

This limit must be observed, that if the means used are such as are common to all, or not exclusively appropriated by another, and injury follows which is not the result of design and improper use of those means, no remedy exists. There may be a design in adopting lawful means to absorb another's trade reputation; yet, if those means are the com-

mon property of all, and are used in a lawful manner, and
damage ensue, it would be *damnum absque injuria.*

But where such means are perverted, and so combined
and used as to represent the goods of one as the manufac-
ture of another, and for the purpose of selling them as such,
there is no room to doubt the power of a court of equity to
grant relief.

Care should be taken not to interfere with the freedom of
trade, or to foster monopolies on the one hand, nor to refuse
relief in a proper case where the cry of monopoly and inter-
ference with trade is deceptive, on the other.

The fraud is most frequently accomplished by the illegal
use of names, forms, words, and numerals which ordinarily
belong to the common stock, and are not the subject of ex-
clusive appropriation. Instead of employing them in their
proper sphere to designate number, size, elements, quality,
description, or give direction or caution, they are selected
because of the known innocent purpose they generally serve,
and combined so as not only to represent quality or other
particles within the scope of their lawfully prescribed func-
tions, but to cause the goods or articles to which they are
attached to be purchased by the public as the make or
manufacture of another; thus violating that great generic
rule which lies at the foundation of all law, that a man must
so use his own property as not to injure the property of
another.

The logic of this position would be conclusive, even were
it without the support of authority.

Mr. Justice Gray, in Gilman v. Hunnewell, 122 Mass.,
150, and the Master of the Rolls in Croft v. Day, 7 Bevan,
84, said that every case of trade-mark, and what is proper
to be done in each, depends upon its own circumstances.

These observations of those learned judges belong to the necessity of such cases, for were the rules of law applicable to trade-marks so fixed and invariable as to try all future cases alone by the past, the wary and cunning would, by evasion, soon abrogate their efficiency. This suggestion is aptly sustained by the present case, where each particle simulated is the common fund of all for the attainment of the ends they commonly subserve.

The law says you may use anything which is the common property of all, or that cannot be exclusively appropriated, but you must use it to convey the ideas which it commonly expresses, and of which it is the accepted sign. You must use it to tell the truth, the whole truth, and nothing but the truth.

You cannot, under pretense of exercising a common right of use, and by reason of the fact that the means used represent the quality and size of your goods, so use them that, while they perform this simple and innocent purpose apparently of representing quality and size, caution and description, you cause them to do more—to represent your goods as those of another, and by the seeming fairness which follows the selection of a legal or innocent instrument or means, escape the consequences of an illegal use thereof. This would be stealing the livery of heaven to serve the devil in.

This would be perverting the privileges and uses of our language, under the pretense of describing one's own, to take another's from him. Can such illegal use be made of written or oral language, because it is no harm to use that language about matters not foreign to its objects?

Quality, size, description, caution, elements, &c., may be indicated or named by the use of the words, letters, and

numerals described above.   This is the appellees' right; but
it is not because the words, letters, and figures do that, that
he is complained of, for he has the right to use them for
those purposes.    But the complaint is, that these letters
and figures have been used not to do this alone which was
rightful, but they have been used for an ulterior purpose.
The appellees selected the same letters, the same words, the
same numerals, and put them in the same colors, and upon
the same places on their plows, as were used by appellants
on their plows.   For what?   To represent quality and size
alone !   Who could believe it!   Why not take type from a
different font?   Why not take other numerals that would
serve the same purpose better ?   Why adopt as a number
"½," "1," "2," "3," "8 ?"   Why "A O," "B O," "C
O," "P O?"   No answer can be given, except that a man
intends the natural consequences of his own act; and the
consequences of this act are to take appellants' trade, built
up on his reputation, and transfer it to appellees, by using
that reputation to sell appellees' plows.

This departure from the easy and common way of using
those letters and figures, and the adoption of a troublesome,
costly, and painfully prepared imitation, both of plows and
letters, is attempted to be excused on the alleged ground
that appellees were making *better* plows than appellants.
This excuse is so transparent a subterfuge to escape the
effects of their conduct, that it deserves to be mentioned
because of its boldness only, and as an illustration of the
intent of appellees.

· Would they take to pieces one of appellants' plows, then
make their's like it, brand them at the same points and in
the same way, paint them alike, make the same interchange-
able metal points, abandon their old lettering, and adopt the

letters and numerals of appellants, if they were making a better plow, and thus run the risk of confusion with inferior plows? Who would thus dig a ditch to fall into himself? The eyes of capital, trade, and commerce are too keen not to see and avoid such folly. No man in his senses would commit it, and we cannot believe the appellees did so. If they did not, then the reason assigned by them for this elaborate imitation is false, and we must look for another and true reason, which may be easily found, for it lies upon the surface, it is pointed out by the experience of the race. Those letters and figures on the skillful imitations, unless we deny the evidence of our senses, the plows having been xehibited to us, were used to enable appellees to sell their plows as and for those of the appellants, and thereby injure their trade reputation, lessen their sales, and share their profits and customers.

The question must not be confined to what the appellees used, but *how* and for what purpose they used the *indicia* copied from appellants' plows.

If so restricted, the case is plain, for what they used they had the right to use, but the manner in which they used these letters and figures constitutes the wrong. They have used lawful things in an illegal way. Instead of using them to designate quality and size merely, which is allowable, they did not content themselves, but, under the pretense of designating quality and size, which the letters and figures really do, they pressed them into another service, by placing them at points and in positions on their plows that corresponded with the manner of their use by appellants. For this reason the appellants' trade-mark could not perform its legitimate functions ; its power of designating their make of plows was lessened, and to that extent their trade coming to

them from their reputation, as evidenced by their trade-mark, was destroyed, and the way opened for appellees to claim that loss as their gain, thus usurping the trade reputation of appellants by the artful manner of using and combining artificial signs common to all as signifying quality and number generally.

Appellees' counsel cite the following text in support of their view: "If, through the lawful and proper exercise by one man of his own rights, a damage results to another, even though he might have anticipated the result and avoided it," it is *damnum absque injuria.* (Cooley· on Torts, p. 31.)·

This is sound law; but if he uses his lawful rights and property in an unlawful or improper manner, then, if damage follow, it is damage with injury where he so uses. his own as intentionally to injure another. This no man has. the right to do, and this is the distinction which appellees' counsel fail to recognize. It is also said that a bad motive may render a bad. act worse, but it cannot render a lawful act unlawful. This is also true; for if a man with a bad motive exercises his rights in a lawful and proper way, and injury ensues, it is damage without legal injury; but if he, with a bad motive, exercise his rights in an unlawful manner, and injury is thereby done to another, there is damage and a legal injury; for instead of exercising his rights in order to their legitimate and full enjoyment, which he may do although it injures another, if he so exercises his rights as not only. to enjoy them himself, but to do more, to go beyond, and use them in such a manner as to intentionally and fraudulently injure another man's rights, it is wrong in principle, condemned by authority, and unsupported by a single analogy fairly and logically applied.

The whole argument of appellees' counsel is based upon the false assumption that a legal injury cannot be done by the improper use of lawful means, and that the very act in question is legal.

There is a difference between lawful means and the unlawful *use* of those means.

A bad intent, it is indubitably true, cannot render a legal act worse, but this rule must not be misapplied. A bad intent cannot render legal means or things illegal, nor can it render a legal act worse, but a bad intent does make an illegal act done by the use of legal things a great deal worse.

This position of the appellees illustrates the difficulty which courts of equity meet in the enforcement of justice in cases of this character.

While the limitation to the exclusive use of the language confines the selfish monopolist to those words, letters, numerals, and symbols which indicate the origin and ownership of his goods, and which no other person can use with like truth, there is also a qualification to the manner in which the residue or common stock may be used. No part of it can be diverted from its ordinary functions, and perverted to the work of piracy.

Though innocent in itself to communicate ideas and represent the product of all labor, its quality, kind, and most minute and general description, they are the most dangerous means with which to misrepresent the goods of one as and for those of another, for it is hard to see the difference, at first blush, between the lawful and unlawful use of that common stock which it is conceded belongs equally to mankind.

Confounding the legality of the means used with the charge alleged in the bill, we are met with the skillful excuse that a bad motive never renders a legal act worse, and

particles which, when properly used for lawful purposes, would be harmless, are piled up, one after another, in such a disconnected way that obscures the effect of their combined power, until the innocent instruments, having done the work of invading appellants' trade reputation, are made the defense to their own misuse.    But whether arising from the common stock, or that which is exclusively appropriated, the use must not be fraudulently abused, and the rights of others wrongfully taken from them, hence we say that courts of equity have jurisdiction, no matter what the means may be, if perverted from their true objects, by which one manufacturer represents and sells his goods as and for those of another.

The general rule as to what constitutes infringement is attempted to be laid down in various cases, but it will be found that no rule can be formulated that will anticipate and embrace every act of infringement.    So each case must depend mainly upon itself for the rule and proof of this essential prerequisite to recovery.

"It is not necessary that the resemblance produced should be such as would mislead an expert, or such as would not be easily detected if the original and the spurious were seen together.    It is enough that such similitude exists as would lead an ordinary purchaser to suppose that he was buying the *genuine* article and not an imitation." (129 Mass., 325.)

"Although the mark might not deceive if placed *side by side* with the plaintiff's mark, it was calculated to obtain for the defendant's goods the *same name* as that by which the plaintiff's were known, and to deceive an ordinary purchaser who had not an opportunity of comparing the marks." (Moses v. Sargood, Ewen & Co., Cox M. T. C., 636.)

Avery & Sons v. Meikle & Co.

"It is a mistake to suppose that the resemblance must be such as would deceive persons *seeing* the two trade-marks placed side by side." (Judge Clifford in Manufacturing Co. v. Trainer, 101 U. S., 64.)

In the case of McAndrew v. Bassett, much importance was attached to the fact that the defendant had laid aside the mark he had previously used, and took up that of the complainant. The lord chancellor said:

"*The fact of its adoption by the defendants is itself pregnant with proof that they regarded it as a thing desirable to be done.* They thenceforth use it in *preference* to what they previously used, and the reason is clearly to be collected from the letter which was the occasion of the first introduction to them of the mark, and the occasion of their adopting it." (10th Jur., N. S., 550 ; Cox's T. M. Cases, 673.)

"In every case," says Vice Chancellor Wood in the Taylor's Persian Thread Case, "the court must ascertain whether the differences are *bona fide*, in order to distinguish the one article from the other; whether the resemblances and the differences are such as naturally arise from the necessity of the case; or whether, on the other hand, the differences are simply colorable, and the resemblances are such as are obviously intended to deceive the purchaser of the one article into the belief of its being the manufacture of another person. *Resemblance* is a circumstance which is of *primary importance* for the court to consider; because if the court finds, as it does almost invariably find in such cases as this, that there is no reason for the resemblance except for the purpose of misleading, it will infer that the resemblance is adopted *for the purpose of misleading.*" (Taylor v. Taylor, 2 Eq. Rep., 290; Cox's M. T. M. Cases, p. 70.)

In Seixo v. Provezende it was said:

"If a purchaser looking at the article offered to him would naturally be led, from the mark impressed on it, to suppose it to be the production of the rival manufacturer, and would purchase it in that belief, the court considers the use of such a mark to be fraudulent. But I go further. I do not consider the actual physical resemblance of the two marks to be the sole question for consideration. If the goods of a manufacturer have, from the mark or device he has used, become known in the market by a particular *name*, I think the adoption by a rival trader of any mark which will cause the goods to bear the *same name* in the market may be as much a violation of the right of that rival as the actual copy of his device." (L. R., 1 Chy., 192; Cox's M. T. M. Cases, p. 146.)

Vice Chancellor Mallins said:

"The rule of the court is, that a man who has adopted a distinguishing mark has a right to be protected against any other person adopting one sufficiently like it to mislead an *unwary public*."

In the same case, upon appeal, the Lord Chancellor, in 1872, said:

"Though no one particular mark is exactly imitated, the *combination* is very similar and likely to deceive. It is true that there is no proof that any one has been deceived or that the plaintiffs have incurred any loss; but where the similarity is obvious, that is not of importance." (Abbott v. Bakers and Confectioners' Tea Association, Cox M. T. C., 213.)

In the justly celebrated opinion of Judge Duer, in the Amoskeag Manufacturing Co. v. Spear, he said: "In an imitation of the original mark upon an article, or goods of

Avery & Sons v. Meikle & Co.

the same description, the name of the proprietor may be omitted; another name, that of the imitator himself, may be substituted; but if the peculiar device is copied, and so copied as to manifest a design of misleading the public, the omission or variation ought to be wholly disregarded. Its object, we may be certain, was not to communicate the truth, but to escape the penalty of falsehood. A fraud is intended, an unlawful gain is meant to be realized, but it is believed or hoped that an injunction may be avoided and a claim for profits or damages be repelled. The fraud, however, if a court of equity is true to its principles, will be suppressed, and its fruits be intercepted or restored. My conclusions on this branch of the subject are, that an injunction ought to be granted whenever the *design* of a person who imitates a trade-mark, be his design apparent or proved, is to impose his own goods upon the public as those of the owner of the mark, and the imitation is such that the success of the design is a *probable* or even *possible* consequence." (Amoskeag Manufacturing Co. v. Spear, 2 Sand., S. C., 599; Cox A. T. M. C., p. 95.)

"Even if the wholesale buyer is not misled, but the small retailer or the consumer is, the right of action exists," was the language used in Dixon Crucible Co. v. Guggenhiem. (See also Clark v. Clark, 25 Barb., and Brooklyn White Lead Co. v. Masury, *Ibid.*)

In the case of Coates v. Holbrook, Vice Chancellor Sandford said:

"A man is not to sell the goods or manufacture of B under the show of pretense that they are the goods or manufactures of A, who, by superior skill or industry, has established the reputation of his articles in the market. The law will permit no person to practice a deception of

that kind, or *to use the means which contribute to effect it.* He has no right, and he will not be allowed, to use the names, letters, marks, and other symbols by which he may palm off upon buyers as the manufacture of another the article he is selling, and thereby attract to himself the patronage that, without such deceptive use of such names, etc., would have inured to the benefit of that other person who first got up or was alone accustomed to use such names, marks, letters, or symbols." (Coates v. Holbrook, 2 Sand. Chy. R., 504; Cox's T. M. Cases, 221.)

The court said, in Gillott v. Esterbrook:

"The design to defraud by manufacturing and packing pens in all respects similar to the plaintiff's, excepting only in the use of the name, appears very plainly. I cannot reason so artificially as to disguise this conclusion from myself."

The language of Lott, senator, in Taylor v. Carpenter, shall close our quotations on the manner infringements have been made, and the means and acts which have been declared to be infringements; he said:

" Honest competition relies only on the intrinsic merits of the article brought into market, and does not require a resort to a false or fraudulent device or token. That certainly cannot deserve the appellation which studiously gives to the product of pretended superior skill the name and exact resemblance and imitation of the article with which it professes to compete. A disguise is not usually assumed for an honest object. It is a mark more characteristic of deception and fraud. It defeats the very end and object contemplated by legitimate competition, the choice to the public to select between the articles sold, and operates as a

Avery & Sons v. Meikle & Co.

deception and imposition on the dealer." (2 Sand. Chy. Rep., 613.)

What is lacking in authority to reach every case of infringement, may be easily supplied from the never-failing fountain of justice, where principle finds universal application. What are the facts of this case?

The appellees have not used a single letter, figure, or word that belongs to appellant's trade-mark proper; yet by the exact simulation of the plow in every perceivable point exposed to an ordinary observer and purchaser, and the use of the same coloring and staining, the same relative position of the letters and figures, as employed and used by the appellants, avoiding the literal appropriation of any part of their trade-mark, the appellees have obscured their own and appellants' trade-mark, but at the same time sought to avoid detection and responsibility in doing so, and to cause their plows to be taken for and purchased as those of appellants.

Thus, by skillful combination of legal particles taken one at a time, and in the aggregate, leaving the mere trade-mark untouched, they have so confused its force and effect as to destroy its office and real efficiency to distinguish the appellants' plows from all others.

*First.* The appellees laid aside their own letters and numerals which they commonly used to indicate the size, series, and qualities of their plows, and literally took up those of the appellants.

*Second.* They quit lettering cast and figuring steel plows, and reversed that order and adopted the order of use by appellants.

*Third.* They consulted and deliberated before adopting the letters and numerals, or imitating the construction of appellants' plows.

*Fourth.* After this deliberation, they so imitated the construction, numerals, and lettering of appellants' plows that nothing but the reading of their trade-mark and close inspection could distinguish the difference.

*Fifth.* They made large quantities of plows, leaving off their own trade-mark and name, and substituted therefor the names of jobbers, who were well known in the market to be venders and not makers of plows, making it therefore in their hands impossible, without the aid of expert knowledge, to tell the difference between a Meikle and Avery plow, as they both had the same *indicia* and were constructed alike, the makers' name being altogether suppressed.

*Sixth.* They have employed small salesmen to sell their plows, who place them on the market one half dollar cheaper than the Avery plow, and so advertise them as to be taken for those of the appellants.

The combined force of this evidence is irresistible. It shows an intentional infringement, and not only possible injury, but such facts from which the law presumes some injury at least to be the necessary consequence.

If such infringement as this be not enjoined, and the profits resulting from it returned, then trade-mark law will never accomplish its prime object named in the first sentence of this opinion on that branch of the subject we have discussed.

The trade-mark and trade reputation pirate always undertakes the difficult task of sailing between the Charybdis and Scylla of the law, but he should never be allowed a successful voyage. If, on the one hand, he escapes the rock by

Avery & Sons v. Meikle & Co.

not infringing through the instrumentality of the trade-mark itself, he will not, on the other, if courts of equity are true to the principles of their own existence, be allowed a safe passage by the use of any means of deceit or false representation known to the inventive brain of man.

Courts of law and equity have finally become possessed of jurisdiction, through the unfolding process of adjudication, ample to protect a trade-mark which may be used by all to distinguish their goods from others; to prevent the sales of the goods of one as being those of another by means of fraud and misrepresentation in the use of marks, signs, words, numerals, or symbols; to afford redress for such sales of goods which are a misleading imitation of those of another for whose manufacture they may be sold, where the sales are made by the use of the trade-mark of another, or direct or indirect intentional false representations or fraud, from which damage is presumed, and its extent may be proven.

In all cases, however, the conduct or adopted means of the imitator must be such as does or would probably deceive the ordinary mass of purchasers.

In conclusion, we repeat that this law grows out of the common principle of justice that the rights of each should be so used as not unnecessarily to injure those of others whose skill has made their goods valuable which consists in their reputation that finally compensates them for their enterprise, industry, and fidelity.

We are, therefore, of the opinion that the relief prayed, so far as not inconsistent with this opinion, should have been granted. Wherefore, the judgment is reversed, and cause remanded for further proceedings consistent with this opinion.

The thanks of the court are tendered to the able counsel on both sides of this case for the great assistance they have rendered us in our efforts to arrive at a conclusion in strict obedience to authority and principle.